IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFF MONSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3066-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jeff Monsen seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title XVI the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) finding that

plaintiff does not meet Listing 12.04 for affective disorders because plaintiff has marked

limitations in the areas of social functioning and maintaining concentration, persistence

or pace, and (2) the ALJ relied on an improper hypothetical because it did not

incorporate plaintiff's marked limitations in (a) sustaining concentration and persistence

on simple tasks, (b) interacting in moderately demanding social situations, and (c)

adapting to a typical work environment.  I find that the substantial evidence in the record

as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## I. BACKGROUND

Plaintiff filed a Title II application for disability benefits on February 17, 2009, which was denied by the Appeals Council on August 23, 2010. He filed another Title II application with the current Title XVI application on September 16, 2010. That Title II application was denied initially based on res judicata because the previous application was denied after plaintiff's last insured date. The previous Title II application was not reopened. Plaintiff's current application alleges that he has been disabled since March 11, 2003; however, he amended his alleged onset date to June 1, 2008. The ALJ considered plaintiff's condition only from the date his application was filed -- September 16, 2010, because only the Title XVI application was properly before him. Plaintiff's disability stems from osteoarthritis, fibromyalgia, past injuries, stress and depression. Plaintiff's application was denied on December 10, 2010. On September 14, 2011, a hearing was held before an Administrative Law Judge. On September 22, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On December 6, 2011, the Appeals Council denied plaintiff's request for review. On January 25, 2002, the Appeals Council again denied plaintiff's request for review after plaintiff had submitted additional evidence. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial

evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450

U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5

(8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the

courts. "[A]n administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision." Id.; Clarke v.

Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

4

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

             Yes = disabled.
             No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

             No = not disabled.
             Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

             Yes = disabled.
             No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Melissa

Smith, in addition to documentary evidence admitted at the hearing.

### A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1975 through

2010, with employer break-down provided for years 1996 through 2010:

| Year | Earnings | Year | Earnings |
|------|---------|------|----------|
| 1975 | $ 7.43 | 1993 | $ 5,595.32 |
| 1976 | 0.00 | 1994 | 7,912.88 |
| 1977 | 122.63 | 1995 | 4,282.59 |
| 1978 | 871.88 | 1996 | 3,093.53 |
| 1979 | 2,041.37 | 1997 | 1,102.92 |
| 1980 | 0.00 | 1998 | 2,448.89 |
| 1981 | 1,135.00 | 1999 | 5,445.10 |

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 5 of 41

| | | | |
|---|---|---|---|
| 1982 | 1,246.50 | 2000 | 4,457.80 |
| 1983 | 417.50 | 2001 | 2,676.28 |
| 1984 | 1,094.21 | 2002 | 3,752.17 |
| 1985 | 1,227.00 | 2003 | 2,788.50 |
| 1986 | 3,622.00 | 2004 | 0.00 |
| 1987 | 0.00 | 2005 | 0.00 |
| 1988 | 543.34 | 2006 | 875.13 |
| 1989 | 3,375.94 | 2007 | 213.50 |
| 1990 | 3,148.69 | 2008 | 0.00 |
| 1991 | 1,564.35 | 2009 | 0.00 |
| 1992 | 4,300.17 | 2010 | 0.00 |

(Tr. at 166-170).

1996

| | |
|---|---|
| 3,093.53 | Leland Enterprises, Ltd. |
| $ 3,093.53 | 1996 Total |

1997

| | |
|---|---|
| 1,102.92 | Cummins Filtration, Inc. |
| $ 1,102.92 | 1997 Total |

1998

| | |
|---|---|
| 253.98 | Piepho Moving and Storage of Lacrosse |
| 61.28 | Enders Tool Co., Inc. |
| 2,133.63 | First Lutheran Church of Albert Lea Minnesota |
| $ 2,448.89 | 1998 Total |

1999

| | |
|---|---|
| 58.00 | Manpower, Inc. |
| 845.92 | A Squared, Inc. |
| 196.80 | Von Weise USA, Inc. |
| 1,435.98 | Carpenter Co. |
| 2,353.62 | NWA Family Shops, Inc. |
| 554.78 | Wal-Mart Associates, Inc. |
| $ 5,445.10 | 1999 Total |

6

**2000**

| | |
|---|---|
| 2,662.03 | Super-8 Motel |
| 1,664.65 | Kwik Star Incorporated |
| <u>131.12</u> | Arby's Roast Beef |
| $ 4,457.80 | 2000 Total |

**2001**

| | |
|---|---|
| 52.00 | Micro Plastics, Inc. |
| 2,345.34 | Valero Services, Inc. |
| 178.26 | E-Z Mart Stores, Inc. |
| <u>100.68</u> | Captain D's |
| $ 2,676.28 | 2001 Total |

**2002**

| | |
|---|---|
| 2,828.55 | L&L Oil Co. |
| 698.50 | D&S Convenience Store |
| <u>225.50</u> | E-Z Mart Stores, Inc. |
| $ 3,752.17 | |

**2003**

| | |
|---|---|
| <u>2,788.50</u> | L&L Oil Co. |
| $ 2,788.50 | 2003 Total |

**2004**

| | |
|---|---|
| 0.00 | 2004 Total |

**2005**

| | |
|---|---|
| 0.00 | 2005 Total |

**2006**

| | |
|---|---|
| 436.50 | Town & Country Super Market, Inc. |
| <u>438.63</u> | Dollar General Corporation |
| $ 875.13 | 2006 Total |

**2007**

| | |
|---|---|
| <u>213.50</u> | Town & Country Super Market, Inc. |
| $ 213.50 | 2007 Total |

**2008**

| | |
|---|---|
| 0.00 | 2008 Total |

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 7 of 41

2009

                    0.00             2009 Total

2010

                    0.00             2010 Total

(Tr. at 166-170).

**Function Report**

         In a Function Report dated October 1, 2010, plaintiff described a typical day as

follows:

> Just getting out of bed is horrible, get my cane go to bathroom, get my medicines
> and try eat something with my pills. After that I try to get dressed and that's hard.
> Pain stiffness, putting on my shoes is really hard.  Oh before I get dressed I put
> on Voltaren on right knee and knee support.  I also got valcose veins left leg I put
> on support stocking for that. The osteoarthritis has set into my shoulders and
> neck so I have my father put Voltaren on my neck, shoulders.  At times I can't
> move my neck either right or left.  I'm keep getting more and more depressed,
> I'm on antidepressants but need more.  I've also been diagnosis with diverticulitis
> (also) just to get up get through day just keeps getting harder and harder,
> physically and mentally.  Pain from the osteoarthritis and fibromyalgia are very
> painful and depressing.  It keeps me from having normal life and supporting
> myself. Right handed as I am, I keep dropping and busting things I lose grip and
> feeling in my right hand.  It's very imberrising.  It also makes it hard to brush
> teeth, peeling potatoes, hurts, gives out, my right hand does, Dr. Says it's
> osteoarthritis and fibromyalgia.  I try to lay down in afternoon for hour, to rest
> myself.  Dinner comes eat, watch news.  I go to bed early.  I eat a little
> something with my bedtime meds and go to bed.  And that's pretty much how my
> day is maybe left a few things out, but that's has good as my mind good explain
> it.

         Plaintiff reported that he is able to prepare sandwiches, breakfast foods, and

hamburgers, although he has to watch what he eats because he has diverticulitis.  He

cooks daily.  He does his own laundry, one to two loads per week and it takes about an

hour and a half.  Plaintiff reported that he goes outside every day, he drives and is able

to go out alone.  He shops in stores for food with his food stamps.  He shops once a

week for a couple hours each time. His parents pay for his personal hygiene items.

His hobbies include reading and watching television. He spends time with his parents daily, he goes to the store once a week, and he attends all of his doctor appointments. He has no problems getting along with family, friends, neighbors, or others; however, he does not socialize.

He does not finish what he starts, and he does not follow instructions very well. He has no difficulty getting along with authority figures. He has trouble handling stress or changes in routine. When asked if he has noticed any unusual behavior or fears, plaintiff wrote, "Very very depressed, also suicidal, feeling hopeless, worthless, panic attacks, nightmares, stressed, health problems stressed Social Security and finances." Plaintiff uses a cane everywhere he goes, even the bathroom.

## B. SUMMARY OF MEDICAL RECORDS

On February 17, 2009, plaintiff filed his previous application for disability benefits. His application was denied on February 21, 2009.

On April 20, 2009, plaintiff saw Michael Ball, D.O., complaining of fibromyalgia,[1] depression, dizziness, urinary frequency, diarrhea, and osteoarthritis (Tr. at 342-346).

---

[1]"1990, the American College of Rheumatology established two criteria for the diagnosis of fibromyalgia: (1) Widespread pain lasting at least three months, and (2) At least 11 positive tender points out of a total possible of 18.
But fibromyalgia symptoms can come and go. And many doctors were uncertain about how much pressure to apply during a tender point exam. While the 1990 guidelines may still be used by researchers studying fibromyalgia, less stringent guidelines have been developed for doctors to use in general practice. These newer diagnostic criteria include: (1) Widespread pain lasting at least three months, and (2) No other underlying condition that might be causing the pain." http://www.mayoclinic.com/health/fibromyalgia/DS00079/DSECTION=tests-and-diagnosis

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 9 of 41

Plaintiff said that his knee goes out on him and he frequently falls. Plaintiff reported that he had been diagnosed with osteoarthritis in his knees and right wrist and hand, and that he had been diagnosed previously with fibromyalgia. If that is the case, those records are not a part of this file. Plaintiff said he frequently drops things with his right hand. Plaintiff walked with a limp. He was unable to heel/toe walk due to right knee pain. "The patient has no instability of the right knee on stress tests. . . . Grip strength is strong bilaterally and there's no deformity to the right hand or right wrist. There is no evidence of any motor or sensory deficit in the upper or lower extremities." Straight leg raising was negative. Plaintiff had seven positive tender points. Plaintiff ambulated without the use of any assistive device. Gait and station were normal. There was no evidence of muscle atrophy.

Plaintiff was alert and oriented, he responded appropriately to questioning, his affect was normal, there were no recent or remote memory changes noted. "The patient complains of pain primarily in his right knee and dorsum of the right hand. On examination there is no swelling or inflammation identified. . . . There was no evidence of any neurologic abnormality on today's exam. There was no evidence of any disorganization of motor function in the upper or lower extremities. There was no evidence of a mental problem. The patient has no restrictions [in his] ability to sit or stand. The patient may [be] restricted in walking on uneven terrain due to his right knee pain. There is no restriction [in] patient's ability to lift or carry or handle smaller objects less than 20 lbs. There's no restriction in the patient's ability [to] hear or speak or travel."

10

Two days later, plaintiff's application for disability benefits was denied on reconsideration. On May 11, 2009, he filed a request for a hearing.

On September 14, 2009, plaintiff was seen by David Dale, D.O. (Tr. at 266). His chief complaint included fibromyositis,[2] upper respiratory infection, anxiety, depression, hypertension, degenerative joint disease of the right knee, allergies, and wanting a flu shot. Plaintiff said his neck, shoulders and knee were hurting. He said Topamax (controls seizures and migraine headaches) and Cymbalta (treats depression and anxiety) upset his stomach. He needed a refill of Topamax and Tramadol.[3] Plaintiff weighed 203 pounds. Plaintiff complained of fatigue, numbness, tingling, and muscle weakness. His pain was a 6 out of 10. He did not report chest pain or shortness of breath. The doctor noted that plaintiff's lab work was good and that his x-rays were normal. Plaintiff's heart and lungs were normal on exam. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he walked with a limp. No psychological abnormalities were noted. Plaintiff's medications were refilled and he was given prescriptions for Claritin (treats allergies) and Flonase (a corticosteroid nasal spray that treats nasal congestion). He was told to discontinue Cymbalta and was given a flu shot.

---

[2]Chronic inflammation of a muscle with an overgrowth of the connective tissue.

[3]Tramadol is used to relieve moderate to moderately severe pain. Tramadol is in a class of medications called opiate agonists. It works by changing the way the body senses pain.

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 11 of 41

On October 16, 2009, plaintiff was seen by Dr. Dale (Tr. at 267). His chief complaint included needing refills on Tramadol and having a scratchy throat and allergies. "Stopped taking Topamax, Cymbalta. Is on Trazodone [anti-depressant] - if he's to continue will need refills. Cymbalta helped with his hurting but caused him to have no appetite, not sleeping." Plaintiff weighed 211.5 pounds, which was 8.5 pounds more than he weighed a month earlier. No abnormalities were noted in his physical or mental condition. His Tramadol was refilled, his Trazodone was refilled, and Keflex (antibiotic) was prescribed.

On November 11, 2009, plaintiff was seen by Dr. Dale (Tr. at 268). He stated that he needed refills on Atenolol and Lisinopril (both treat high blood pressure). He said Claritin worked for the first week but then stopped working. He complained of neck and knee pain for which he had been taking Ibuprofen. His allergies had been bothering him. Plaintiff weighed 213 pounds. He reported fatigue, numbness, tingling, and muscle weakness with pain rated a 7 out of 10. Plaintiff did not complain of chest pain or shortness of breath, and his lungs and heart were normal on exam. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. No gait disturbance was noted; however, Dr. Dale prescribed a cane (Tr. at 347). Plaintiff's Lisinopril and Atenolol were refilled, he was started on Savella[4] and Singulair (treats asthma) and was given Voltaren gel (non-steroidal anti-inflammatory).

---

[4]Treats fibromyalgia, which causes muscle pain and stiffness. This medicine is a selective serotonin and norepinephrine reuptake inhibitor.

On December 17, 2009, plaintiff was seen by Dr. Dale for a follow up (Tr. at 269). "No complaints". Plaintiff asked for "something for the pain during the day." The Voltaren gel was helping. The record says he wanted to try Savella; however, that medication had been prescribed at his last appointment so this is a curious notation. Plaintiff weighed 213 pounds. His lab work from November 11, 2009, was "very good." Plaintiff reported fatigue, numbness, tingling, muscle weakness and "pain all over" which he rated as an 8 out of 10. He was noted to be in no acute distress. On exam, his heart and lungs were normal. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he was using a cane. He was given a prescription for Savella and Phenergan (for nausea). His Singulair, Flonase, Tramadol and Trazodone were refilled.

On January 15, 2010, plaintiff was seen by Dr. Dale (Tr. at 254, 270). His chief complaint included hypertension, osteoarthritis, fibromyositis, anxiety, depression, and a need for refills. Plaintiff reported that Savella was helping. Plaintiff complained of fatigue, numbness, tingling, and muscle weakness, and he rated his pain a 6 out of 10. He was observed to be in no acute distress. He did not report chest pain or shortness of breath. His heart and lungs were normal. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he was using a cane. He was observed to have a flat affect, but there were no other psychological abnormalities noted. He was given refills

13

on Savella, Phenergan, Singulair, and Trazodone.  He had no complaints about his medication.

On February 17, 2010, plaintiff was seen by Dr. Dale (Tr. at 253, 271).  His chief complaint included fibromyositis, anxiety, depression, nausea, hypertension, chills, feeling "yucky," and needing refills on medications.  Plaintiff described his pain a 7 out of 10.  He was observed to be in no acute distress.  His heart was normal, his lungs were normal.  Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much.  No psychological abnormalities were noted.  His Atenolol, Lisinopril, Voltaren gel, and Flonase were refilled.

On February 24, 2010, plaintiff was seen by Dr. Dale (Tr. at 252, 272).  His chief complaint included hypertension, osteoarthritis, fibromyositis, diverticulitis,[5] allergies, anxiety, depression, runny nose, and itchy/watery eyes.  Plaintiff weighed 215 pounds. He complained of fatigue, numbness, tingling and weakness with pain rated as a 7 out of 10.  He was observed to be in no acute distress.  Plaintiff did not complain of chest pain or shortness of breath.  His exam was normal.  He was given a prescription for Claritin.

_____

[5]"Diverticulitis occurs when one or more diverticula in your digestive tract become inflamed or infected. Diverticula are small, bulging pouches that can form anywhere in your digestive system, including your esophagus, stomach and small intestine. However, they're most commonly found in the large intestine. Diverticula are common, especially after age 40. When you have diverticula, the condition is known as diverticulosis. You may never even know you have these pouches because they seldom cause any problems, such as diverticulitis. Sometimes, however, diverticulitis occurs. This condition can cause severe abdominal pain, fever, nausea and a marked change in your bowel habits." http://www.mayoclinic.com/health/diverticulitis/DS00070

On March 24, 2010, plaintiff was seen by Dr. Dale (Tr. at 251, 273). His chief complaint included fibromyositis, osteoarthritis, anxiety, depression, varicose veins, diverticulosis, allergies, and a need for refills on medication. He had no complaints about his medication. He reported his pain a 7 out of 10. He was observed to be in no acute distress. He did not complain of chest pain or shortness of breath. Plaintiff weighed 210 pounds. His heart and lungs were normal on exam. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was noted to have a flat affect but no other psychological abnormalities. Plaintiff's Tramadol, Trazodone, Promethazine (treats nausea, also called Phenergan), and Savella were refilled.

On April 12, 2010, an administrative hearing was held in plaintiff's previous disability case.

On April 26, 2010, plaintiff was seen by Dr. Dale (Tr. at 250, 274). Plaintiff's chief complaint included fibromyositis, anxiety, depression, varicose veins, allergies, "fighting a bug," a lot of sinus drainage and a need for a refill on medications. Plaintiff weighed 213 pounds. He complained of fatigue, numbness, tingling, muscle weakness, and "pain all over." He did not report chest pain or shortness of breath. Plaintiff's exam was normal including his heart and lungs, except the examiner circled "decreased" "strength" "ROM" under musculoskeletal, without indicating where plaintiff's strength or range of motion was decreased or by how much. He was noted to have a flat affect but

no other psychological abnormalities.  His medications were refilled.  No other treatment was provided.

On April 28, 2010, plaintiff's previous application for disability benefits was denied by an administrative law judge.

On July 2, 2010, plaintiff was seen by Dr. Dale (Tr. at 275).  Plaintiff needed refills on all of his medications and had no complaints about them.  He weighed 211 pounds.  Plaintiff reported fatigue, numbness, tingling, and pain "all fields" which he rated a 9 out of 10.  Plaintiff was observed to be in no apparent distress.  His heart and lungs were normal.  Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much.  He was observed to have a gait disturbance because he was using a cane.  He was observed to have a flat affect but no other psychological abnormalities were noted.  All of his medications were refilled.

On July 24, 2010, plaintiff was seen by Steven Adams, Psy.D., after having been referred by the Family Support Division of Howell County in connection with his application for Medicaid (Tr. at 257-259).

> BACKGROUND INFORMATION:
> Chief Complaint:  Primary symptoms include depressed mood, feeling hopeless, suicidal thoughts, thoughts of death, anxiety, fearfulness, poor concentration and muscle tension.  He reports feeling depressed about not being able to support himself. He reports wanting to die but no suicide intent was reported.  Other symptoms include feeling worthless, irritable mood, socially withdrawn, memory problems, fatigue, nightmares, change of appetite, panic attacks, racing thought, rapid heartbeat, decreased interest.  He reports being stressed by health problems, filing for Social Security and finances.

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 16 of 41

<u>History of Illness and Treatment</u>:  In 2003 he held a rifle to his head, pulled the trigger and the gun would not fire. No previous psychiatric hospitalizations were reported. He has been treated with Prozac, Cymbalta and Doxepin.  He was treated at Behavioral Healthcare in 2008.

* * * * *

<u>Education</u>:  Jeff dropped out of school during the tenth grade in order to work. He reported making Cs and Ds. No retentions or special education was reported. At age 14 he was hospitalized for one month with spinal meningitis.  His illness affected his school attendance.

<u>Occupation</u>:  . . .  [H]e worked at convenience stores for ten years.  He drove a truck until 1995.  He decided to end that career.

<u>Social</u>:  Jeff reports having no friends.  He spends his time with his parents.

* * * * *

<u>Medical History</u>:  At age 14 he was hospitalized for one month for spinal meningitis. At age 12 [his] leg was run over by a tractor.  At age 31 his neck and shoulder were injured in a motor vehicle accident.  His current medical problems include osteoarthritis, fibromyalgia and an injured right knee.  No tobacco use was reported.

* * * * *

**BEHAVIORAL OBSERVATIONS AND MENTAL STATUS:**  Jeff . . . was oriented to person, place and time.  He was alert and responsive. Appropriate eye contact was made. The applicant's appearance was casual and clean.  He walks with a limp on his right side.  Rapport was easily established.  Mood was sad and angry.  Affect was consistent with conversation and facial expression. Speech was clear and normally paced. One out of three words was recalled after five minutes. With hints he was able to recall one other word. Four digits were repeated forward and three digits were repeated backward. The serial seven task was failed. The word "world" was spelled forward and backward. Thirteen times five was correctly calculated without the use of paper. The applicant's general fund of information was average. Verbal concepts were understood at an average level. Abstract concepts were verbalized at a concrete level. No hallucinations or delusions were reported.  He reports suicide ideation without intent.  No homicide ideation was apparent. Judgment is fair.  Impulse control is good. Intelligence is estimated as low-average.

Based on these tests, Dr. Adams assessed major depressive disorder and a global assessment of functioning of 45. He recommended antidepressants and possibly antipsychotic medication. He strongly recommended individual psychotherapy to work on stress management and to monitor suicidal ideation.

**RECOMMENDATIONS:**
. . . Regarding his ability to work he seems able to understand and remember simple instructions. He does not seem able to sustain his concentration and persistence on simple tasks. He does not seem able to interact in moderately demanding social situations. He does not seem able to adapt to a typical work environment.

On August 11, 2010, plaintiff was seen by Dr. Dale (Tr. at 276). Plaintiff complained of sore throat, ear pain and nasal drainage. He said he had been seen by a psychologist who recommended an antidepressant. Plaintiff weighed 209 pounds. He reported fatigue, numbness, tingling and pain all over. He was observed to be in no acute distress. His heart and lungs were normal on exam. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. No gait disturbance was observed. He was noted to have a flat affect but no other psychological abnormality. He was assessed with major depressive disorder, fibromyositis, allergies, and hypertension. He was prescribed Lexapro (treats depression and anxiety) and was told to discontinue Savella.

On August 23, 2010, the Appeals Council denied plaintiff's request for review in his previous disability application.

On September 13, 2010, plaintiff was seen by Dr. Dale (Tr. at 277, 282). Plaintiff complained of varicose veins. He said that since he stopped the Savella he was having more pain and using the Voltaren gel more. He weighed 207 pounds. He reported fatigue, numbness, tingling, and pain all over which he rated a 10 out of 10. He was observed to be in no acute distress. His heart and lungs were normal. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he was using a cane. No psychological abnormalities were noted. Plaintiff was assessed with "fibromyositis (fibromyalgia)", major depressive disorder, hypertension, asthma and allergies. His Tramadol, Trazodone, Singulair, Atenolol, Lisinopril, Voltaren Gel, Flonase, and Loratidine (Claritin) were refilled. He was told to discontinue Lexapro and he was restarted on Savella.

On September 16, 2010, plaintiff filed his second application for disability benefits which began this case.

On October 13, 2010, plaintiff was seen by Dr. Dale (Tr. at 281, 301). Plaintiff stated that he "needs to stay on Lexapro - stopped Savella." Plaintiff said he has trouble getting around at times due to his right knee being swollen and hurting. Plaintiff weighed 209 pounds. He reported fatigue, numbness, tingling, and "pain all over" which he rated an 8 out of 10. Plaintiff was observed to be in no acute distress. He did not report chest pain or shortness of breath. His heart and lungs were normal on exam. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM"

without indicating where plaintiff's strength or range of motion was decreased or by how much.  He was observed to have a gait disturbance because he was using a cane.  He was noted to have a flat affect but no other psychological abnormality.  Plaintiff's Lexapro was refilled and he was prescribed Vicodin, a narcotic.

On November 10, 2010, Sherry Bassi, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 284-286).  Dr. Bassi found that there was no evidence of limitation in plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  She found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

Dr. Bassi concluded with: "The claimant can follow simple directions and make basic work-related decisions. He can relate adequately to peers and supervisors. He can adapt to routine changes in a work environment."

That same day Dr. Bassi completed a Psychiatric Review Technique (Tr. at 287-297). She found that plaintiff suffers from anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking. She found that he had no restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.

In support of her findings, Dr. Bassi wrote the following:

Relevant Psych Sources: Dr. Adams Psych Eval (DFS) 07-24-10 DX [diagnosis] Major Depressive Disorder Ox3 [oriented times three, or to person, place and time, sad and angry, stressed by health problems, endorse multiple psych sx's [symptoms], serial 7's failed does ok with "world" spelled backwards.

Dale Family Medical records note MDD [major depressive disorder] as recent dx, but minimal info re: severity

06/09 Behavioral Healthcare f/u GAF=65 return to primary md [doctor] f/u [follow up] some things improved

Func. Report: Mostly physical limitations, can prepare meals and do his own laundry, drives, leaves the house independently, doesn't socialize, difficulty following written directions.

The cl[aimant]'s allegations appear partly credible. He does have some depressive symptoms. The severity of symptoms he reported at the 07/10 DFS exam do not appear consistent with other evidence in the file - i.e., imitations on function report are primarily physical, and limited psychiatric treatment history.

On November 19, 2010, plaintiff was seen by Dr. Dale (Tr. at 300). He weighed 213 pounds. Plaintiff reported only tingling but said his knee pain was a 6 out of 10. His physical exam was entirely normal. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he was using a cane. He was observed to have a flat affect but no other psychological abnormality was noted. Plaintiff was assessed with elevated cholesterol and triglycerides, major depressive disorder, and fibromyositis. He was told to follow a diet for his triglycerides, he was prescribed Castor (oil), and he was told to elevate his legs.

On December 2, 2010, plaintiff had x-rays of both his knees taken due to complaints of knee pain (Tr. at 298). No abnormality was observed, including "no significant arthritic change identified."

On December 10, 2010, plaintiff's application for disability benefits was denied initially.

On December 20, 2010, plaintiff was seen by Dr. Dale (Tr. at 299). Plaintiff complained of increased elbow pain "(also knee)". He weighed 216 pounds. Plaintiff's entire physical exam was normal including his general appearance, neck, heart, lungs, abdomen, bowel sounds, and extremities. Under musculoskeletal, the examiner circled "decreased" and "strength" and "ROM" without indicating where plaintiff's strength or range of motion was decreased or by how much. He was observed to have a gait disturbance because he was using a cane. He was observed to have a flat affect but no other psychological abnormality was noted. Plaintiff was assessed with elevated cholesterol and triglycerides, major depressive disorder, and fibromyositis with 14 tender points. His Gemfibrozil (lowers cholesterol) was refilled.

On February 7, 2011, plaintiff saw Dr. Dale for a follow up (Tr. at 325). He said his blood pressure had been running high. On this day, it was 128/94. He weighed 218 pounds. Plaintiff reported fatigue, stiffness, history of widespread pain for 3 or more months, memory loss, sleep disturbance, inability to ambulate effectively and pain in 11 or more pressure points. His physical exam was normal; no psychological abnormalities were observed. Plaintiff was assessed with fibromyositis, anxiety, depression, hypertension, high cholesterol, allergies, and upper respiratory infection. His Voltaren gel, Atenolol, Singulair, Flonase, Tramadol, and Trazodone were refilled. Dr. Dale increased plaintiff's Lisinopril due to his elevated blood pressure.

On February 14, 2011, plaintiff saw Dr. Dale and said he would like his right hand x-rayed because it hurt, and "needs handicap paper filled out for license." (Tr. at 324). Plaintiff's physical exam was entirely normal. He was noted to be using a cane. He said he experienced morning pain that he rated a 9 out of 10. He was observed to be in no acute distress. Dr. Dale referred him for an x-ray.

On February 15, 2011, plaintiff had x-rays of his right wrist after having hit his hand on a door two days earlier (Tr. at 318-319). The results were normal.

On February 21, 2011, plaintiff saw Dr. Dale to review his wrist x-rays (Tr. at 323). His physical exam was entirely normal. He was told to use heat and ice on his wrist and to take Motrin for pain.

On March 2, 2011, plaintiff was seen at Ozarks Medical Center complaining of chest discomfort (Tr. at 306-313, 317). Plaintiff reported no abdominal pain or nausea. As far as his musculoskeletal system, he reported only problems with pain in the hands from arthritis associated with swelling. As far as his psychological condition, plaintiff reported that he "has depression that has been well treated with Lexapro and Trazodone." He reported that he "has been on disability since 2007." His strength was "satisfactory" in all four extremities. An EKG showed that he had had a heart attack. Plaintiff had a stent put in the proximal dominant right coronary artery. On discharge he was told to follow a cardiac diet. "He is to refrain from strenuous exertion and should [lift] no more than 15-20 pounds on an infrequent basis." His pre-hospital medications were changed. "We stopped his Gemfibrozil, Loratadine [Claritin], Singulair, Atenolol and Voltaren. He was advised to refrain from use of all non-steroidal anti-inflammatory

drugs or systemic steroids." On discharge his medications included aspirin, Plavix
(blood thinner), Simvastatin (lowers cholesterol), fish oil, Lexapro, Trazodone, Coreg
(treats high blood pressure and congestive heart failure), Lisinopril, Ultram (also called
Tramadol) and Fluticasone nasal spray.

On March 7, 2011, plaintiff saw Dr. Dale and said he needed nitroglycerin[6] to
carry with him (Tr. at 322). Plaintiff weighed 215 pounds. His physical exam was
entirely normal. He complained of knee pain. Under musculoskeletal, the examiner
circled "decreased" and "strength" without indicating where plaintiff's strength or range
of motion was decreased or by how much. He was observed to have a gait disturbance
as he was using a cane. His psychological exam was entirely normal. He was
assessed with post MI (myocardial infarction, or heart attack), coronary artery disease,
hypertension, high cholesterol, allergies, fibromyalgia, and arthritis. He was prescribed
Vicodin; and his Plavix, Simvastatin, Coreg, and Lisinopril were refilled. He was given a
prescription for 50 nitroglycerin pills.

On March 17, 2011, plaintiff saw his cardiologist, Alan Troy, M.D., for a follow up
(Tr. at 314-316). Plaintiff had been doing well with no chest pain, no shortness of
breath, no orthopnea (shortness of breath while lying down), no leg swelling, no fainting
or light-headedness, no drop in blood pressure when standing. He was assessed with
coronary artery disease, hypertension and elevated cholesterol. He had no fatigue, no
cough, no nausea or abdominal pain, no myalgias (muscle pain). He did report some
arthralgias (joint pain). He was alert and articulate. His psychological evaluation was

---

[6]Treats chest pain.

"unremarkable." He was in no evident distress. His physical exam was entirely normal. His treatment consisted of "cardiac rehab if he is able, blood work in early June 2011, and follow up in four months."

On June 13, 2011, plaintiff went with his father to Dr. Dale's office (Tr. at 321). Plaintiff's father had an appointment that day. The note states as follows: "He had transferred to Dr. Ball d/t [due to] he felt you did not take time with him. You spoke of other things and disregarded his needs. He felt you never followed up with anything. He was disgusted so he didn't come back. You are a good doctor, thorough and up to date. But he didn't like waiting 3 1/2 hours. He now wants [to] return to you as his doctor. He was not pleased with Dr. Ball. His dad has an appt and he would like to be seen today. After telling him I had to ask you if we could work him in he decided not to be seen at all."

On August 25, 2011, plaintiff was examined by Bruce Preston, M.D., in connection with his disability application (Tr. at 329-331). Plaintiff was described as "pleasant". He reported a chief complaint of arthritis in his knees and hands. He reported sometimes dropping glasses while washing dishes, and he said his knees "occasionally swell." He reported being able to stand for five minutes at a time, walk for five minutes at a time but said he walks very slowly and uses a cane. "Sometimes at home he actually uses a walker because he has problems with falling." He reported being able to sit for a maximum of 15 minutes at a time. Plaintiff reported having two stents placed after his heart attack, although the medical records indicate only one was placed. He reported having chest pain about twice a week. Under "past history" it was

26

noted that he "has had some depression". Plaintiff reported that he "worked as a truck driver for about 16 years in the past and then later worked as a store attendant and a grocery clerk." Plaintiff reported "some fatigue, . . . sometimes has some neck stiffness, . . . has had chest pains, leg cramps and palpitations, sometimes has some nausea, . . . states he has problems with decreased memory, sometimes headaches, anxiety and depression, bothered by back pain, joint pain, joint stiffness and swelling. Sometimes has muscle pain. Does not tolerate heat well." Dr. Preston observed that plaintiff was very cooperative. He was able to get on and off the exam table but moved very slowly and used a cane continually to walk to the exam table. He was able to arise from a supine position without any assistance. Plaintiff had no swelling in his extremities and no obvious joint deformities. He had full range of motion in all of his joints. He had good grip strength in both hands. Straight leg raising was negative. He was unable to heel walk or toe walk, but he could squat and arise by placing one hand on a table. Dr. Preston assessed arthritis, recent heart attack, high cholesterol, high blood pressure, and depression. "He would be capable of performing a sedentary type of occupation where he is primarily sitting, but able to get up at least every 15 minutes. He really shouldn't be doing any stair climbing or anything very exertional. He would be very limited in his lifting ability. It would be unwise for him to be lifting more than about 10 pounds. He would need to avoid extremes of heat and cold."

That same day Dr. Preston completed a Medical Source Statement - Physical (Tr. at 334-339). He found that plaintiff could lift up to 10 pounds frequently and to 20 pounds occasionally; sit for 15 minutes at a time and for four hours total per day; walk

for 5 minutes at a time and for a total of 1 hour per day; stand for 5 minutes at a time and for a total of 1 hour per day.  The form asks if the individual "requires" the use of a cane to ambulate, and he checked, "yes."  He also checked, "yes" when asked if the use of the cane was "medically necessary."  His findings with regard to reaching were that plaintiff could occasionally reach, push and pull with his right hand and that he could frequently reach, push and pull with his left hand.  He found that plaintiff could frequently handle, finger and feel with his right hand and he could continuously handle, finger and feel with his left hand.  When asked to identify the medical findings which form the basis of this opinion, Dr. Preston left that part of the form blank.  He found that plaintiff could frequently use foot controls.  He found that plaintiff could occasionally climb stairs and ramps, stoop, kneel, crouch, or crawl, but that he should never climb ladders or scaffolds or balance.  Again, he left blank the part of the form asking for the medical findings supporting this opinion.  He found that plaintiff should have no exposure to unprotected heights, extreme cold or extreme heat.  He found that plaintiff could have occasional exposure to moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, vibrations, and that he could occasionally drive.  He found that plaintiff could perform all of the following activities:  shop, travel without a companion, ambulate without using a wheelchair or walker, ambulate without using two canes or two crutches, use standard public transportation, climb a few steps at a reasonable pace, prepare a complete meal and feed himself, and care for his personal hygiene.  He found that plaintiff could sort, handle or use paper files.  He could not, however, walk a block at a reasonable pace on rough or uneven surfaces.

28

On September 22, 2011, the ALJ issued his opinion finding plaintiff not disabled.

## C.   SUMMARY OF TESTIMONY

During the September 14, 2011, hearing, plaintiff testified; and Melissa Smith, a vocational expert, testified at the request of the ALJ.

### 1.   Plaintiff's testimony.

At the time of the hearing plaintiff was 48 years of age and is currently 50 (Tr. at 29).  He is 6'1" tall and weighs 215 pounds (Tr. at 30).  Plaintiff completed the ninth grade, dropped out in tenth grade, and did not get a GED (Tr. at 30).  Plaintiff is single and lives with his parents (Tr. at 30).  Plaintiff has a driver's license and can drive (Tr. at 31).  If he tries to drive for an hour or more, it bothers his eyes and his back (Tr. at 41).  Plaintiff helps his parents by doing the dishes, but he does not vacuum or do laundry (Tr. at 31).  Plaintiff can cook (Tr. at 31-32).

Plaintiff stopped working in 2003 after cashiering and stocking shelves for L&L Oil Company in Mountain Home, Arkansas (Tr. at 32).  Plaintiff quit that job because his pain was preventing him from sleeping (Tr. at 32).  Plaintiff had arthritis and he had to stand on concrete at work (Tr. at 33).  Back on June 1, 2008, plaintiff had arthritis in his knees and joints, his spinel, his neck and his shoulders (Tr. at 33).  Plaintiff has been diagnosed with fibromyalgia and although he believes he had it in June 2008, he does not remember when he was diagnosed (Tr. at 33).

Plaintiff wore a wrap on his right dominant hand during the hearing (Tr. at 34).  Plaintiff drops things and went to Dr. Jones, a specialist, and had an MRI done on his right hand (Tr. at 34-35).  Plaintiff had been wearing the support, and Dr. Jones

confirmed that plaintiff has arthritis and told him to continue wearing the support (Tr. at 35). It helps with pain and support (Tr. at 35). Plaintiff constantly drops things when he is cooking or doing dishes (Tr. at 35).

Plaintiff actually worked for a brief time in 2006 -- he sacked groceries and stocked shelves at Richards Brothers in Mountain View, Missouri (Tr. at 35). He worked for five or six weeks but had to quit because he was in so much pain from his arthritis that he could not sleep (Tr. at 35-36). In 2007 he worked for Dollar General Store in Willow Springs, Missouri (Tr. at 36). He worked there for a few weeks, but he would be in so much pain that he could not function (Tr. at 36).

Plaintiff has been diagnosed with major depressive disorder (Tr. at 36-37). He has had depression for quite a few years (Tr. at 37). He takes Lexapro which helps him (Tr. at 37). He continues to have problems with worthlessness: "Oh a lot of the worthlessness. I mean it helps to some extent but it still the worthlessness and the now being on all this new medication that's doing it, I think." (Tr. at 37). Plaintiff is not receiving any kind of mental health treatment or counseling (Tr. at 43). Dr. Dale prescribes his Lexapro (Tr. at 43).

Plaintiff had a heart attack on March 2, 2011 (Tr. at 37). Plaintiff went to Ozark Medical Center and had a stent put in (Tr. at 37-38). Plaintiff now has tremors in his head, shoulders and hands (Tr. at 39). Those occur daily (Tr. at 39). Plaintiff continues to have chest pain when he climbs stairs or inclines (Tr. at 39). He has to take nitroglycerine to go get the mail because there is an incline (Tr. at 39). Plaintiff takes nitroglycerine every day (Tr. at 39-40). Plaintiff's shortness of breath and chest pains

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 30 of 41

were occurring back in June 2008 (Tr. at 40). Plaintiff has high blood pressure, but it is controlled with medication (Tr. at 40). Plaintiff last saw his cardiologist in June 2011 (Tr. at 43). During that visit, plaintiff's cholesterol medication was switched from Simvastatin to Crestor (Tr. at 43). Plaintiff was supposed to have a follow up in July 2011 but could not get to his appointment because of car troubles and he had not yet made a new appointment (Tr. at 43).

Plaintiff uses a cane because he fell two or three times and his knee cracks and pops because of his osteoarthritis (Tr. at 40-41). Plaintiff said it occurred two years ago November 2011, so that would have been in November 2008 (Tr. at 41).

Plaintiff feels tired, weak, and dizzy after taking his Plavix and his other medication in the mornings (Tr. at 41).

Plaintiff can sit for 30 minutes at a time (Tr. at 42). He can stand for 15 minutes at a time (Tr. at 42). Plaintiff lies down for at least an hour every day (Tr. at 42). Plaintiff can lift no more than a gallon of milk (Tr. at 42).

**2.    Vocational expert testimony.**

Vocational expert Melissa Smith testified at the request of the Administrative Law Judge. Plaintiff has two jobs which qualify as past relevant work: cashier/checker, light, semi-skilled with an SVP[7] of 3; and grocery bagger which is medium unskilled with an SVP of 2 (Tr. at 45).

---

[7]Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. And SVP of 3 means over 1 month up to and including 3 months. An SVP of 2 means anything beyond short demonstration up to and including 1 month.

31

The first hypothetical involved a person who could lift 20 pounds occasionally and 10 pounds frequently; walk or stand for over two hours per day; sit for six hours per day; occasionally climb stairs; never climb ropes, scaffolds or ladders; occasionally balance, stoop, crouch, kneel and crawl; should avoid prolonged exposure to temperature extremes, humidity, wetness and vibrations; would need to avoid unprotected heights and hazardous machinery; he can do simple tasks but is limited to jobs that do not demand attention to details or complicated instructions to job tasks; he has the ability to maintain attention and concentration for two hours at a time and adapt to changes in the workplace on a basic level (Tr. at 46). The vocational expert testified that such a person could not do either of plaintiff's past relevant jobs (Tr. at 46). The person could perform the following sedentary unskilled jobs: pharmaceutical processor, DOT 559.687-034, with 620 in Missouri and 27,350 in the country; dowel inspector, DOT 669.67-014, with 430 in Missouri and 16,500 in the country; or administrative support worker, DOT 209.587-010, with 2,950 in Missouri and 151,980 in the country (Tr. at 46).

The second hypothetical involved a person with the same exertional limitations as the first hypothetical but who could sit for four hours per day total and for 15 minutes at a time; occasionally climb stairs but never climb ropes, scaffolds, or ladders; occasionally stoop, kneel, crouch or crawl; occasionally push or pull with the right upper extremity; occasionally reach and handle with the right upper extremity; should avoid temperature extremes, chemicals, dust, fumes, nauseous odors, humidity, wetness, vibration, unprotected heights and hazardous moving machinery (Tr. at 47). The

vocational expert testified that such a person could not work (Tr. at 47).

The third hypothetical was the same as the first except the person could do no frequent grasping or handling with either hand; no bilateral handling, fingering or manipulating; and no pushing, pulling or lifting above shoulder level (Tr. at 48). The vocational expert testified that the three jobs listed in hypothetical one do not require working above shoulder level, but that do require frequent handling (Tr. at 48). With these limitations, the person could not work (Tr. at 48).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Michael Shilling entered his opinion on September 22, 2011 (Tr. at 11-23).

Step one. Plaintiff has not engaged in substantial gainful activity since September 16, 2010 -- the application date (Tr. at 13).

Step two. Plaintiff suffers from the following severe impairments: fibromyositis, coronary artery disease status post stenting, and depression (Tr. at 13). Plaintiff's right knee and right hand/writ osteoarthritis are non-medically determinable impairments (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14). Plaintiff's mental impairment does not meet Listing 12.04. He has no restriction in his activities of daily living; moderate limitation in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 33 of 41

Step four.  Plaintiff maintains the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand or walk for two hours per day; sit for six hours per day; can occasionally climb ramps or stairs but should never climb ropes, ladders or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; must avoid prolonged exposure to temperature extremes, vibration, humidity and wetness; must avoid unprotected heights and hazardous moving machinery; can perform simple tasks but is limited to jobs that do not demand attention to details, complicated job tasks or instructions (secondary to depression, reported chronic pain and potential side effects of medications).  He can maintain attention and concentration for minimum two-hour periods at a time, and he can adapt to changes in the workplace on a basic level (Tr. at 16).  With this residual functional capacity, plaintiff cannot perform his past relevant work as a cashier/checker or grocery bagger (Tr. at 22).

Step five.  Plaintiff can work as a pharmaceutical processor, dowel inspector, or administrative support worker, all of which are available in significant numbers (Tr. at 23).  Therefore, plaintiff is not disabled (Tr. at 23).

## VI.    LISTING 12.04

Plaintiff argues that the ALJ erred in finding that he did not meet listing 12.04 Affective Disorders.  He claims that he has marked limitations in the areas of social functioning and maintaining concentration, persistence or pace thereby satisfying the "B" criteria.  The ALJ gave minimal weight to the opinion of Dr. Steven Adams and instead gave significant weight to the opinion of the consultative psychologist, Dr. Bassi, who never examined or saw plaintiff which plaintiff claims was in error.

It is plaintiff's burden to show that he meets or equals the criteria for any listed impairment. Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987); Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). If plaintiff has an impairment that is described in the listings, but does not exhibit one or more of the findings specified in the listing, or one or more of the findings is not as severe as specified in the particular listing, he must provide findings of equal medical significance to the criteria specified for a listed impairment. 20 C.F.R. § 416.926. Plaintiff has not proven that he satisfies the criteria of any listing in this case, nor has he offered the requisite medical evidence to show equivalency to any listing.

Pursuant to the regulations, a claimant will meet listing 12.04 if there is medically documented evidence of one of the following:

A.
  1. Depressive syndrome characterized by at least four of the following:
     a. Anhedonia or pervasive loss of interest in almost all activities; or
     b. Appetite disturbance with change in weight; or
     c. Sleep disturbance; or
     d. Psychomotor agitation or retardation; or
     e. Decreased energy; or
     f. Feelings of guilt or worthlessness; or
     g. Difficulty concentrating or thinking; or
     h. Thoughts of suicide; or
     i. Hallucinations, delusions, or paranoid thinking;
or
  2. Manic syndrome characterized by at least three of the following:
     a. Hyperactivity; or
     b. Pressure of speech; or
     c. Flight of ideas; or
     d. Inflated self-esteem; or
     e. Decreased need for sleep; or
     f. Easy distractability; or
     g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

35

h.    Hallucinations, delusions or paranoid thinking;
or
3.    Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.    Resulting in at least two of the following:
1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Marked difficulties in maintaining concentration, persistence, or pace; or
4.    Repeated episodes of decompensation, each of extended duration;

OR

C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1.    Repeated episodes of decompensation, each of extended duration; or
2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

Plaintiff focused his argument on paragraph B, and did not offer any evidence that his impairment met the criteria of paragraphs A or C.  However, plaintiff must satisfy the criteria contained in both paragraphs A and B, or paragraphs A and C to be found disabled.

Administrative Law Judge Michael Shilling had this to say about the listing:

The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04.  In making this finding the undersigned has considered whether the "paragraph B" criteria are satisfied. . . .

36

In activities of daily living, the claimant has no restriction. The claimant testified that he is able to cook and clean dishes. Any alleged limitations in this area were reported as being resultant from physical limitations as opposed to being related to any mental impairment.

In social functioning, the claimant has moderate difficulties. The claimant reported rarely socializing and having no friends. However, he reported spending significant time socializing with his parents. It appears that he would be capable of socializing in an acceptable manner in a work setting. This is supported by the fact that he was able to easily establish rapport with the examiner during the consultative psychological examination.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant is likely to have some difficulties in this area due to some memory problems and occasional suicidal thoughts. However, he would still be capable of performing simple tasks that do not demand attention to details or complicated instructions.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant's conditions would not cause him to decompensate if just a minimal increase in his mental demands or a change in his environment were presented. As mentioned above, the claimant does not have repeated episodes of decompensation of extended duration. There is no evidence of the claimant needing a highly supportive living arrangement in order to function well. The claimant has demonstrated the ability to function independently, regardless of if he was in his own home or elsewhere.

(Tr. at 14-15).

It is noteworthy that Administrative Law Judge Eric Benham found in plaintiff's

first disability case on April 28, 2010, that plaintiff's mental impairment was not severe.

Plaintiff did not appeal that case. He now argues that by September 16, 2010 -- less

than five months later -- his mental impairment not only became severe, it became of listing level severity.  A review of the treatment records from April 28, 2010, to September 16, 2010, shows that plaintiff had only three appointments with a treating physician during that time.

July 2, 2010 -- Dr. Dale observed plaintiff to have a flat affect but no other psychological abnormalities were noted.

August 11 2010 -- Dr. Dale observed plaintiff to have a flat affect but no other psychological abnormality.

September 13, 2010 -- Dr. Dale examined plaintiff and no psychological abnormalities were noted, not even a flat affect.

Even after plaintiff filed his application in this case, his treatment records show no worsening of his mental impairment:

October 13, 2010 -- Dr. Dale noted that plaintiff had a flat affect but no other psychological abnormality.

November 19, 2010 -- Dr. Dale observed plaintiff to have a flat affect but no other psychological abnormality was noted.

December 20, 2010 -- Dr. Dale observed that plaintiff had a flat affect but no other psychological abnormality was noted.

February 7, 2011 -- Dr. Dale indicated that no psychological abnormalities were observed.

March 2, 2011 -- Plaintiff told Dr. Troy that he "has depression that has been well treated with Lexapro and Trazodone."  There is no indication in the hospital records that

38

plaintiff was observed having any problems interacting with any of the hospital staff or medical personnel.

March 7, 2011 -- Dr. Dale performed an exam and plaintiff's psychological exam was entirely normal.

March 17, 2011 -- Dr. Troy noted that plaintiff was alert and articulate. His psychological evaluation was "unremarkable." He was in no evident distress.

It is clear from plaintiff's treatment records that Judge Shilling's finding, in this case, that plaintiff's depression is a severe impairment was somewhat of a stretch and clearly gave plaintiff the benefit of any doubt.

Comparing plaintiff's <u>treatment</u> records with his medical records dealing only with his application for government benefits shows that plaintiff greatly exaggerated his mental symptoms when he was being seen in connection with benefits. On July 24, 2010, plaintiff saw Dr. Adams in connection with his application for Medicaid. Although Dr. Dale had observed nothing more than a flat affect a couple weeks earlier and again a couple weeks later, plaintiff's report to Dr. Adams was markedly different: He experienced a depressed mood, feeling hopeless, suicidal thoughts, thoughts of death, anxiety, fearfulness, poor concentration, wanting to die. Other symptoms included feeling worthless, irritable mood, socially withdrawn, memory problems, fatigue, nightmares, change of appetite, panic attacks, racing thoughts, rapid heartbeat, and decreased interest. These are remarkable allegations coming from a man who had no observable psychological symptoms other than a flat affect when he was seen just a

few weeks earlier and a few weeks later by the doctor who was treating him for depression.

Comparing these <u>allegations</u> to the <u>observations</u> of Dr. Adams, it again becomes evident that plaintiff exaggerated his mental symptoms: He was oriented to person, place and time. He was alert and responsive. Appropriate eye contact was made. His appearance was casual and clean. Judgment was fair. Impulse control was good. Affect was consistent with conversation and facial expression. Speech was clear and normally paced. The word "world" was spelled forward and backward. Thirteen times five was correctly calculated without the use of paper. His general fund of information was average. Verbal concepts were understood at an average level. Abstract concepts were verbalized at a concrete level.

The only mental abnormalities Dr. Adams observed were the following: Mood was sad and angry. One out of three words was recalled after five minutes and with hints he was able to recall one other word. The serial seven task was failed. That is it. It is clear that Dr. Adams's opinion relies heavily on plaintiff's subjective allegations which are wholly different than those presented to his treating doctors.

Because Dr. Adams's opinion relies almost exclusively on plaintiff's non-credible[8] subjective allegations, the ALJ properly discredited Dr. Adams's opinion.

## VII.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ relied on an improper hypothetical because it was not clear when he questioned the vocational expert what affect plaintiff's inability to

---

[8]I note that plaintiff did not raise a credibility argument in his brief.

stoop, kneel, or crouch had on his residual functional capacity (see page 20 of plaintiff's brief). The ALJ's hypothetical included the ability occasionally to balance, stoop, crouch, kneel and crawl. There is no evidence that plaintiff had an "inability to stoop, kneel and crouch." His x-rays were normal. His physical exams were essentially normal.

Plaintiff's argument on this issue is very vague and it was only in his conclusion that I was able to determine that he took issue with the ability to stoop, kneel and crouch in the hypothetical. To the extent plaintiff believes any other limitations, mental or physical, should have been included in the hypothetical, I find any such argument without merit. The mental issue has been addressed above, and plaintiff's physical residual functional capacity as assessed by the administrative law judge is supported by the substantial evidence in the record.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 6, 2013

Case 6:12-cv-03066-REL   Document 19   Filed 09/07/13   Page 41 of 41